May police accord. My name is Rene Valladares. I'm a federal defender and I represent Mr. Toms. In this case, the officer that approached my client and detained my client in a Terry stop for the purposes of investigating a potential theft of a vehicle lacked reasonable suspicion that my client was in fact in the course of potentially stealing that car. And second, not only that, but the officer went ahead and went outside of the scope of whatever the officer may have been permitted to do by escalating the situation immediately and asking questions about guns, weapons, and requesting that my client go ahead and permit him. If the officer had caused to stop your client, then he clearly could ask about guns. That's one of the things that an officer could be concerned about. He stops an individual, he can say, hey, are you armed? Or can I pat you down to see whether you're armed? So once you get past the point of finding there was reasonable suspicion, you know, once you get to this point of what you call escalation, I think you're in a very slippery territory. Yeah, have you reached that point though? Shouldn't that officer have taken your client over to the young woman who had made the call, the citizen informant to begin with, to make sure that this is indeed the individual that she had alerted the police? That certainly could have been good police practice. Could have been, but should it have been? Should have been? Should he have done that? I don't know if I would make that argument. Nonetheless, I would certainly make the argument that something more needed to happen. Why couldn't the officer conduct a stop simply because the person's sitting in a car that's obviously been driven there and it doesn't have license plates? If it were on the road, the police certainly could pull it over. She could have pulled it over. Why couldn't she just detain him for that? You're in a car without license plates. You're committing a violation of California law. There you are in the car, sitting behind the driver's seat. You have no license plates. I want to talk to you about that. What's wrong with that? Well, one, the officer didn't even confirm that. The officer got to the scene. The officer went ahead and basically positioned herself behind her vehicle, ordered my client to come out. And at that point, my client did come out. No, it says she drove up and the car was as described. And it was described as a car without license plates. She did say that. However, the record doesn't, again, reflect that. She saw the plate, the absence of the plate. And furthermore, the record does reflect that the car was backed to the pharmacy. People have plates in the front, too. In California, you're required to have them in both places, I believe. Well, Your Honor, yeah. Well, in this case, it was in Nevada that the stop occurred. Excuse me? In Nevada. Excuse me, of course. You're right. But doesn't Nevada pretty much follow California law with regard to that? My understanding, Your Honor, is that what it requires is one in the back. All right. Okay. Now, and again, my position being, of course, at that point, the only thing that the officer had is that you have, you know, a black male from 19 to 20 in a vehicle, going through searching. That had been described. I'm sorry? A vehicle that had been described. A vehicle that has been described. Exactly. Yeah, exactly. And, you know, the only thing being the issue of the plate, she gets there, it doesn't confirm that. And again, immediately she goes into the issue of, you know, do you have weapons? Can I search you? So on and so forth. Well, assuming she could, assuming Judge Kaczynski said that she could detain him, for example, for the plate or for something else, if she simply asked, do you have weapons, what's wrong with that? On you, are you armed? Is there something wrong with that? She can't ask that question? It would be my position that that would be an impermissible escalation under the facts of what she has before her. What's your best case for the proposition that if an officer's properly made a terrorist stop, if it's a proper stop, the officer cannot ask, are you armed? Well, I think that basically we got two good examples are Matarolo. I think the Barone case are pretty good. It's pretty good, too, in the sense that in that case, basically what the court goes ahead and does is essentially affirm the officer's asking of questions concerning drugs and narcotics, because there were numerous, I think there were six different things that could be specifically pointed to that, in fact, did create reasonable suspicion that the individual in the vehicle was transporting drugs. I'm not talking about drugs. I'm talking about weapons. I think there's a distinction. I mean, an officer doesn't have to worry that she's going to be hit over the head with a bail of marijuana, but she might be worried that she's going to be shot. Well, I guess, again, my position would be that I don't think an officer should be permitted to go ahead and if they stop me going home because I have my taillight is broken, to immediately go into a questioning concerning whether I have weapons and, you know, can I go home? She can order you out of the car, though, right? I'm sorry, sir? She can order you out of the car, correct? She can go ahead and stop me, certainly, yes. And so you can order you out of the car. And like I said, what's your best case that she can't say, do you have any weapons on you? Before I approach you, I'd like you to tell me do you have any weapons on you? Just what's the best case, that's all. I don't mean a marijuana case. Terry itself, I mean, Terry itself says that basically the officer should go ahead and limit himself or herself to the scope of what is being handled in that matter. And in this case, certainly, we don't have anything which is remotely indicative that there were any weapons. What about the fact that this was a 9-11 call? It wasn't a traffic stop. And shouldn't the officer have been more concerned about her safety receiving a 9-11 call? No, because in this case, there was absolutely no indication that the individual was armed, dangerous, had any weapons, had threatened anybody, had been aggressive in any matter. Well, now, if you look at the totality of the circumstances, the citizen informant told the police that there were two individuals going through cars and indicating breaking into cars, actually, because they've used some kind of weapon, perhaps, to get into those cars. So why shouldn't the officer at least ask, do you have any weapons? Well, the citizen informant didn't say anything about the officer, the two individuals, actually having any kind of weapon or actually breaking into any of the cars. Or entering the cars. And in fact, when the citizen informant, Ms. Poff, the manager of the pharmacy, was cross examined, she stated very specifically that she, herself, did not see this individual speaking in any way or anything to that effect. So, again, I don't think that, and when the citizen informant, Ms. Poff, the manager of the pharmacy, did not see anything that could give her any reason to believe that this was a dangerous individual. The officer basically saw an individual that was seated at the car. The officer didn't see the individual being aggressive, being threatening. The individual didn't have anything in his hand. The individual complied with her request to get out of the car. He complied with her request to go ahead and position himself in front of the vehicle. Did he consent to search the vehicle? All of these kinds of things? Yes. So, what's wrong with him? Well, my point is that, again, that was outside of the scope of what the officer should have been permitted to do with what she had that justified the Terry's stop in this case. And, again, obviously, I argue that she didn't have sufficient information to go ahead and do the Terry's stop for the purposes of, say, a car theft. She didn't have that. Do you have a minute left? Do you want to save it for a bottle? Yes, sir. Please. Thank you. Good morning. William Reed for the United States U.S. Attorney's Office, Las Vegas, Nevada. As I understand the defendant's position and argument in this case, the issue is whether or not Officer Scheer had a reasonable basis to conduct an investigatory detention in this matter. But we know he was detained as soon as she asked him out of the car. I mean, he conceded that much. Yes, Your Honor. And the government concedes he was detained by Officer Scheer, no question about it. What did she have at that point that would have justified the detention? Your Honor, Officer Scheer had the dispatch report from the dispatcher, which originated with the manager of the Rite Aid Pharmacy, and which detailed that there was this suspicious activity, and it wasn't just left as a But there were two males, not just one.  suspicious, but when you look at it objectively, there's some guy sitting in the car, at least with respect to the guy sitting in the car. There was information about another guy looking in car windows, but by the time the officer shows up, that's not confirmed. She doesn't see anybody looking in windows. And there's nothing connecting them. That's correct. Except their color, their skin color. Your Honor, that's correct. Pardon? Except their skin color. Well, there are other additional factors. The car and the person there, I take it. Yes, Your Honor. So the two people, what connects the two people is they're both black. There's nothing else they have in common. There's no hand signals. There's no eye contact. There's no conversation. There's nothing to connect the two guys, except they're both black and male. And the managers report that they were both involved in activities involving vehicles that she thought was related to auto theft. Well, one of them was sitting in a vehicle. The other one was looking in car windows. The manager, how divine that they were engaged in a joint enterprise, but there was no objective. There was nothing connecting them, except what was in the manager's mind, except the fact they were both black and male. Was there anything else connecting them? Well, yes, Your Honor. The manager reported one sitting, one actually just sitting in the vehicle. There's no lights going through the vehicle. And the vehicle was parked three spaces from the front of the store, backed in. I don't think you heard my question. Yes, Your Honor. I'm going to ask it again. Was there anything objectively stated by the manager that connected the two guys? The fact that one guy is in a car, sitting there looking through the contents of the car, another guy is somewhere else in the parking lot looking through windows, doesn't strike me as being inherently coordinated. I mean, you can have people sitting in a car in a parking lot and have somebody else walking in the parking lot doing some other things. What was it that connected the two people? Was there any indication of any conversation between them observed by the manager? Were they observed talking? Your Honor, I don't know. Yes or no? No, sir. Okay. Were they observed waving at each other? No, sir. Okay. Making eye contact? Not that I'm aware of, Your Honor. What was it that connected these two guys, other than the fact they're both male and both black? Your Honor, just that they were in the parking lot together, Your Honor, and the activities. Why do you say they were together? Pardon? Why do you say they were together? Which goes to the heart of the question that Judge Kosinski asked you. Just in the manager's viewpoint, they were together, or there were two. But that's not, that's embarrassingly not enough. The fact that an informant thinks in his mind that, oh, these two people are acting together, is simply not enough. It doesn't make them acting together.  And I'm sure they're both wearing the same uniform. If they're seen talking to each other, if they're seen exchanging eye signals or hand signals or something of that sort, then you say they're together. But as far as objective facts are shown, there are two people, one sitting in a car, one walking around in the parking lot, that the manager somehow thinks are connected to each other. And by the time the officer arrives, the guy that's walking around is gone. So all you've got is left is one guy sitting in a car. It turns out to be his car. Did the manager indicate that she saw both of these individuals get out of this car without license plate? No, Your Honor. She did not report that. She just reported the two individuals and the information that had been related to her by a customer that entered the ride-in. So it's a double hearsay. She didn't even observe this herself. Is that right? I believe she testified at the evidentiary hearing that she did corroborate the presence of the individuals together, and the individual in particular, the defendant, in the vehicle, with the absence of the license plates in part adjacent to the front door. Now, what exactly did she say about the guy in the vehicle? Your Honor, she reported that the individual, as I related earlier, was going through the vehicle, that the vehicle had no license plates on it, that the trunk was open, that... Do you know whether Nevada requires one plate or two plates? Your Honor, I don't want to argue with counsel. I understood it required two plates, but I may be mistaken about that. So if it is one plate and the officer gets there, he sees the car backed up against the wall, so the back of the car can't be seen from the right-hand. Isn't that a non-confirmation of the informant's observations? Of that asset. There are two other things. She talks about two guys. One of them is missing. So one of the things that the informant reports is gone altogether. And then the business about the license plates, he's in another position to tell whether there are license plates. Certainly can't tell whether there are license plates in the back. So when she says there are no license plates, must have been guessing. Maybe she didn't see a license plate in the front. Even if Nevada does require license plates, two plates, which of course we don't know, if she's in no position to tell whether there's a plate in the back... That's correct, Your Honor. But she observed, one individual, the position of the car, was corroborated with the information provided by the manager. He was, at this point, according to the... Have you ever sat in a parking lot in a riot aid right before getting out? I mean, we all do that once in a while. Sometimes you get in a riot aid and you realize, you know, I dropped my wallet at home. Do I have a credit card? Do I have some cash in the car to make my purchase? Because I left my credit. You know, I've done that. You've done that. Everybody's done that. There's nothing inherently suspicious about sitting in the car and looking through it. It's your car. Yes, Your Honor. I'll concede that. But innocent conduct can be part of the totality of the circumstances that form the basis for reasonable suspicion. Okay. So what do they have here that is, when added to this innocent conduct, adds up to reasonable suspicion? Well, when she approached and asked the individual... Well, before she asked him, she observed him slouched in the car, as she described. She approached the individual. She asked him to get out of the car. So it's unlawful in Nevada to have bad posture? No, Your Honor, but... Well, what does a slouching do? I mean, other than cast aspersions on him, was there an indication that he was hiding or what? Well, she said she was not able to see his hands, and that was a concern for Officer Scheer. But that's usually the case when people sit in cars. They don't usually sit like this, do you? No, Your Honor. You usually sit like that? No, Your Honor. With your wife? No, Your Honor. Your children? No, sir. Maybe children. No, sir. So the fact that he can't see their hands is not suspicious. It's just sort of the way human anatomy works. Hands happen to be... Can you see my hands now? No, sir. Give you concern? No, sir, but I hadn't had... But Officer Scheer had a report from the manager that there was possible vehicle theft activity, and she was prudently following up on that. It sounds to me like the manager said, I don't like to have black people in my parking lot. That's what it sounds like to me. Well, she reported it. She says, hey, police, my name is Shannon. There's a black man in the parking lot. Come quick. That's a direct quote, right? I don't believe that was a direct quote, Your Honor. She reported... Well, why don't you check? I just read it. If you think I read it wrong, you just correct me. Maybe I read it wrong. I don't know. Your Honor, as I understood her, that the vehicle was parked back into the parking space near the front door, had no license plates, the individual was going through the vehicle, and the other factors that Your Honor has alluded to. So it was not just that in a vacuum, as I understood the evidence, Your Honor. I'm sorry? It wasn't just the demographic information that Your Honor related in a vacuum. It was the other information about the activities. I see my time is up. You know, there's almost nothing that this guy did that I haven't done myself on frequent occasions in parking lots. I'm always dropping things. I'm always looking for stuff. I don't often talk very well. And he's going to get a license plate soon. You know, one of those front plates, I had to get one of those. Well, thank you. Yes, Your Honor. Thank you. You have a minute for a bottle if you wish to take it. Thank you. Just a couple of points. Number one. You think if it was me there in the parking lot, she would have called? I'm sorry. You think if it was me in the parking lot doing what this guy did, she would have called the police? No, it wouldn't have happened. Because I look so honest? It wouldn't have happened, period. I would have. But you know me. Concerning the issue of the hands, apparently she was worried about the hands. She stated that as soon as she commanded him to come out, she saw nothing in his hands. And, again, that he was very cooperative. As to the second individual in the parking lot, Ms. Poth, the manager, specifically stated in cross that she never saw them together, never saw them talking. I think the government has conceded that. I think you're driving a nail. One more point concerning that. Detective Kelly, who I called to the stand, who interviewed her the next day. Her, the manager, or her, the police? Yes, sir. I'm sorry. Her, the manager. Okay. Detective Kelly states that what she reported, the manager reported, is that she never saw them, she never saw the second fellow at all, period. Okay. Now. I think your time is up. Yes. Thank you, sir. Thank you. Case is argued. We'll stand submitted.
judges: Kozinski, Fernandez, Hatter